[Cite as *State v. Bey*, 2019-Ohio-423.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                        Court of Appeals No. L-17-1288

      Appellee                                Trial Court No. CR0201702200

v.

Darnell Lamarr Bryant Bey                   **DECISION AND JUDGMENT**

      Appellant                              Decided:  February 8, 2019

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Karin L. Coble, for appellant.

* * * * *

**OSOWIK, J.**

### Introduction

{¶ 1} On October 18, 2017, a jury found Darnell Bryant Bey, the appellant herein,

guilty of felony murder with a gun specification, and the Lucas County Court of

Common Pleas sentenced him to a mandatory term of 18 years to life in prison.

Appellant appealed.

**{¶ 2}** In this case, we address whether appellant's failure to raise the issue of a defective indictment until after the jury was empaneled waives all but plain error review; whether the indictment's failure to identify an underlying offense and/or the mens rea of that underlying offense amounts to a defect; and if so, whether the filing of a bill of particulars that identified felonious assault as the predicate offense, remedied any defect. As set forth below, we answer all three questions in the affirmative. That is, under a plain error review, the bill of particulars in this case cured the otherwise defective indictment and provided adequate notice of the underlying offense supporting appellant's murder charge. We also find that appellant's conviction is not against the manifest weight of the evidence and that the court's order of restitution was proper. Accordingly, the trial court's November 9, 2017 decision is affirmed.

**Facts and Procedural History**

**{¶ 3}** The state presented evidence that appellant, aged 19, shot and killed "S.H.," aged 16, on the afternoon of June 11, 2017, in the street next to Sherman Elementary School, in Toledo.

**{¶ 4}** The victim's friend, "A.J.," testified that, on the day of his murder, the victim texted her and asked her to meet him on the school playground. A.J. met him there, and the two talked while seated on a bench, located inside a fenced area of the school's playground. Within ten minutes, three "boys," all of them unknown to A.J., rode up on their bikes. The victim got up from the bench and, walking backward with his eyes on the boys, exited the gate. The victim then turned and began to run across Peck

2.

Street, which borders the school. A.J. watched as appellant, who was in the middle of the street, "pulled out a gun and shot [the victim]." The victim "fell immediately."

{¶ 5} Appellant was the last to pedal away, and before he did, he looked directly at A.J., who remained near the bench. A.J. testified that appellant "was standing up on the bike almost like dropping a gun while he was looking at me." A.J. could not recall what appellant was wearing, except to say that he was not wearing a hat. After they were gone, A.J. flagged down the driver of a car to ask for help, and the driver called 911.

{¶ 6} Officer Gary Bunting and his partner were the first to respond to the dispatch. When Bunting turned his patrol car onto Peck Street, he saw a person standing in the middle of the road flagging him down and another person lying near the curb, on his left side, face up, close to the intersection of Peck and Walnut Street. Bunting testified that the victim was alive, but non-responsive. "Within a minute," an ambulance arrived, and the victim was transported to the hospital, where he died later that day.

{¶ 7} Toledo Police Detective Jeffery Jackson, who works in the scientific investigations unit, processed the crime scene and took photographs. When he arrived at the scene, about 3:15 p.m., he collected evidence, including a fired 9 millimeter shell casing that police found on the sidewalk, near the intersection of Peck and Walnut Streets. Later, Jackson attended the autopsy and observed bullet fragments that were removed from "inside the victim's skull." According to the coroner, who testified, the bullet entered the back of the victim's skull and exited on the opposite side. The actual bullet was not recovered.

3.

{¶ 8} The police viewed videos captured by three surveillance cameras that were in the area. The first video, taken by a camera attached to the school, shows the victim walking backward, exiting the playground through the gate. A second or two later, three males on bikes follow him. All four then moved out of view of the camera. The second video, taken from a private residence on a nearby street (Locust), shows two boys on bicycles riding down the road, followed ten seconds later, at 2:32:12 p.m., by a third boy, who was later identified as appellant. The third video is similar to the second, taken around the same time, from a front porch of a home on Peck Street and shows the same two boys on bikes, followed seconds later by appellant. After appellant and his friends biked out of view, two police cars can be seen driving down Peck Street, toward the school (in the opposite direction of the bikers), in response to the 911 dispatch.

{¶ 9} Portions of the videos were released to the public, and "within a few days" the three young men on bicycles were identified as appellant, Omar Sykes, and Antonio Scott. A warrant was issued for appellant, and a photo array, that included appellant's picture, was shown to A.J. on June 27, 2017. A.J. identified appellant as the shooter.

{¶ 10} Detective Anderson interviewed appellant at 10:00 p.m. on July 3, 2017, after his arrest. The interview was played for the jury. When asked if he knew why a warrant had been issued for his arrest, appellant asked if it had something to do with "the bike situation." Det. Anderson responded that appellant was there because of "the thing that happened at Walnut and Peck * * * near Sherman School." Appellant asked, "I'm here because I'm a witness, right?" Anderson told appellant that the police had viewed

4.

videos and talked to "eye-witnesses" including "Sykes." At that time, Anderson provided appellant with his Miranda rights.

{¶ 11} During the course of the interrogation, appellant admitted that he had been with Sykes and Scott; that they were on their bikes; that he had seen the victim near the playground; and that the victim was with a "female." Appellant told the detective that he tried to talk to the victim, but the victim "got up and walked away." He maintained that "that's when somebody shot him." Appellant heard a gunshot, but he did not see the shooter, because he was facing the victim and watched him fall after being shot. Appellant confirmed that he was the last of this friends to bike away. He maintained that he was fixing his bike chain, which caused him to be momentarily delayed.

{¶ 12} Appellant admitted that he had, in the past, "fought it out" with the victim over something the victim said about one of appellant's friends, but ever since then, their relationship was "cool," and appellant "had no trouble with the man." Appellant maintained his innocence, throughout the interrogation. When it ended, the police notified appellant that he would be charged with murder.

{¶ 13} The victim's mother, "F.H.," testified that her son and appellant had gone to Sherman Elementary School together and that there was "bad blood" between them. Sometime in 2016, appellant knocked on the door of her home and asked to see the victim. Outside, the victim and appellant exchanged words. When F.H. went to see what was going on, she observed appellant put his fists up in the air, as if to fight. Appellant told F.H., "no disrespect, but they telling me your son want to fight me." F.H. told

5.

appellant not to listen to what others were saying and then told appellant to leave.  As he did, appellant told the victim, "I catch you."

{¶ 14} After her son's murder, F.H. captured several "screen shots" from appellant's Facebook page.  Five days before the murder, a post appeared on appellant's page that said, "[g]ot this big o ruger 40 shots clip im going to blame it on em," followed by several emojis (i.e. pictures), including two gun emojis.  A "ruger" is a type of firearm.  During his interrogation with the police, appellant was shown the post, and he did not deny that it was his.  Two additional posts appeared the next day, now four days before the murder.  One said, "[i]f you know Rambo is a hoe drop a like comment or emoji."  Evidence introduced at trial established that the victim's street name was "Rambo."  The other post that day said, "Life's not fare im trying kill something purg." [Sic].

{¶ 15} Excerpts from jail house phone conversations between appellant and third parties were played for the jury.  In the first, on July 9, 2017, appellant asked an unidentified woman, who called appellant "baby," for a "favor" which consisted of deleting all of his Facebook posts.  Appellant explained that, "I don't want Facebook no more."  Three days later, appellant asked the same woman whether she had "deactivat[ed]" his Facebook account yet.  The woman answered that she had not, due to a lack of internet access.  Appellant responded that she should "get around wifi quick * * * cuz that shit not * * * no joke."  In the two other calls, appellant can be heard talking to his mother and then an unidentified female, which the state alleged was evidence that

6.

appellant was attempting to create an alibi for himself at the time of the murder. The audio quality of the last two phone calls was poor.

{¶ 16} Following a three day trial that began on October 16, 2017, a jury returned a guilty verdict, and the trial court ordered a presentence investigation. On November 9, 2017, the trial court sentenced appellant to prison "for a period of Life with parole eligibility after having served a full 15 years in prison." The court ordered an additional mandatory prison sentence of three (3) years for the gun specification, to be served consecutively, for a total mandatory prison term of 18 years.

{¶ 17} Through appellate counsel, appellant assigns the following errors by the trial court for our review:

**Assignment of Error One**: The indictment was defective such that appellant's Due Process rights pursuant to Ohio Const. Art. I, § 10 and the Fifth Amendment to the U.S. Constitution were violated.

**Assignment of Error Two**: Appellant's conviction is against the manifest weight of the evidence, and appellant is entitled to a new trial.

**Assignment of Error Three**: The trial court erred in imposing restitution because it failed to consider, on the record, whether appellant had the ability to pay.

**The bill of particulars cured the defective indictment.**

{¶ 18} In his first assignment of error, appellant claims that his indictment on the charge of murder was defective because it failed to "identify the predicate offense and the *mens rea* of the predicate offense."

7.

{¶ 19} Crim.R. 12(C) provides that "[p]rior to trial, any party may raise by motion any * * * objection * * * that is capable of determination without the trial of the general issue. The following must be raised before trial: * * * (2) Defenses and objections based on defects in the indictment * * *." Appellant claims that he "challenged the indictment before trial. (TT., p. 83)." We disagree.

{¶ 20} That part of the transcript cited by appellant establishes that defense counsel objected to the inclusion of a particular *jury instruction,* not to the indictment. Specifically, defense counsel indicated that he would object to an instruction of the term "knowing" because, "neither the element of knowingly nor the greater charge of felonious assault is set forth in the indictment." Even if the objection could be characterized as one involving the indictment, it would be considered untimely. Counsel raised the objection during a recess on the first day of trial, after the jury was impaneled but before opening statements. A failure to make a Crim.R. 12 motion until after the jury is empaneled waives the objection. *State v. Boaston,* 6th Dist. Lucas No. L-15-1274, 2017-Ohio-8770, ¶ 53, *discretionary appeal allowed,* 2018-Ohio-2418. "By failing to timely object to a defect in an indictment, a defendant waives all but plain error on appeal. Crim.R. 12(C)(2)." *State v. Horner,* 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26, paragraph three of the syllabus; *see also State v. Skatzes*, 104 Ohio St.3d 195, 2004-Ohio-6391, 819 N.E.2d 215, ¶ 26. Reversal for plain error is warranted only when, but for the error, the outcome of the trial would have been different. *State v. Waddell*, 75 Ohio St.3d 163, 166, 661 N.E.2d 1043 (1996). Notice of plain error "is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest

8.

miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus. Accordingly, we review the indictment for plain error only.

{¶ 21} The state filed a single count indictment against appellant on July 13, 2017. It states, in relevant part,

> DARNELL LAMARR BRYANT-BEY, on or about the 11TH day of JUNE, 2017, in Lucas County, Ohio did cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that was a felony of the first or second degree and that was not a violation of § 2903.03 and § 2903.04 of the Revised Code, in violation of § 2903.02(B) and § 2929.02 OF THE OHIO REVISED CODE, MURDER * * *. (Emphasis removed.)

{¶ 22} R.C. 2903.02(B), commonly referred to as the "felony murder" statute, provides that, "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code." The felony murder statute imposes strict liability. *State v. Nolan,* 141 Ohio St.3d 454, 2014-Ohio-4800, 25 N.E.3d 1016, ¶ 9. "Though intent to commit the predicate felony is required, intent to kill is not. * * * [T]he basic tenet of felony murder liability is that the *mens rea* of the underlying felony is imputed to the participant responsible for the killing." (Citation omitted.) *Id. See also State v. Fry,* 125 Ohio St.3d 163, 2010-Ohio-1017, 926 N.E.2d 1239, ¶ 43 ("[A] person commits felony murder

9.

[under] R.C. 2903.02(B) by proximately causing another's death while possessing the mens rea element set forth in the underlying felony offense.").

{¶ 23} Here, appellant complains that the indictment failed to specify the underlying felony, i.e. the particular "offense of violence," supporting the felony murder charge and failed to identify the mens rea of that underlying felony. The issue is whether those omissions render the indictment defective. We address the former issue first.

{¶ 24} "[A]n indictment that tracks the language of the charged offense *and* identifies a predicate offense by reference to the statute number need not also include each element of the predicate offense in the indictment." (Emphasis added.) *State v. Buehner*, 110 Ohio St.3d 403, 2006-Ohio-4707, 853 N.E.2d 1162, ¶ 7. In *Buehner,* the indictment tracked the language of the charged offense (ethnic intimidation) and specifically identified a predicate offenses by statutory number, i.e. "R.C. 2903.21." *Id.* at ¶ 12. The court commented that "it is the predicate offense itself and not the elements of the predicate offense that is an essential element of the charged offense." *Id.* at ¶ 12, citing *State v. Buehner,* 161 Ohio App.3d 546, 2005-Ohio-2828, 831 N.E.2d 457, ¶ 5 (8th Dist.) (Gallagher, J., dissenting). In finding that the indictment was not defective, the Ohio Supreme Court concluded that the state's failure to list the elements of the predicate offense in the indictment "in no way prevent[ed] the accused from receiving adequate notice of the charges against him." *Id.* at ¶ 11.

{¶ 25} In this case, the indictment tracked the language of the charged offense, i.e. R.C. 2903.02(B). It failed, however, to include the "essential element" of the underlying offense, and for that reason we find that it was defective. Under *Buehner,* however, "the

10.

omission of an underlying offense in the indictment can be remedied by identifying the underlying offense in [a] bill of particulars." *Buehner* at ¶ 10, citing *Skatzes* at ¶ 30.

{¶ 26} Two recent appellate cases highlight the use of a bill of particulars to cure a defective indictment. In *State v. Thomas,* 3d Dist. Allen No. 1-16-36, 2017-Ohio-4356, count four of the indictment alleged that the defendant engaged in a pattern of corrupt activity and recited the language of the charged offense, R.C. 2923.32(A)(1), but it did not specify the predicate offense for that charge. The bill of particulars specified that the predicate offenses were those charged in counts one, two and three of the indictment, i.e. possession of heroin, trafficking in heroin, and illegal manufacture of drugs, as well as the uncharged offenses of marijuana possession and trafficking. The court of appeals found that the bill of particulars, which was filed three months before trial, cured the indictment's defect and provided the defendant with "ample time to prepare a defense." *Id.* at ¶ 66.

{¶ 27} More recently, in *State v. Baker,* 2d Dist. Montgomery No. 27818, 2018-Ohio-3925, the defendant was indicted on charges of kidnapping and felonious assault, both felonies, and domestic violence, a misdemeanor. The indictment tracked the specific statutory language of the kidnapping offense, R.C. 2905.01(A)(2) (which prohibits restraining another's liberty "[t]o facilitate the commission of any felony or flight thereafter"), but it did not specify the predicate offense. The bill of particulars alleged that the defendant "cause[d] serious physical harm to the victim," but it too failed to identify a predicate offense by name or statutory number. Nonetheless, the court found that the language of the bill of particulars "effectively" identified felonious assault, "the

11.

only other felony in the indictment, [as] the predicate offense." *Id.* at ¶ 16. The court concluded that, based on the indicted offenses, the applicable statute, the lack of an objection, the bill of particulars, and the record from the guilty plea, the defendant's due process rights had not been violated.

{¶ 28} Unlike the indictments in *Thomas* and *Baker,* the indictment in this case charged no other offenses which could arguably have put appellant on notice as to what the predicate offense was. Like those cases, however, the state filed a bill of particulars, which states, in part, "To wit: Darnell Bryant-Bey did cause the death of [S.H.] as the proximate result of committing or attempting to commit an offense of violence that was a felony of the second degree, namely *felonious assault, in violation of R.C. 2903.11(A)(2).*" (Emphasis added.) Because the bill of particulars identified the underlying offense, by name and by number, we find that it was sufficient to remedy the indictment. Given the timing of when it was filed, i.e. the first day of trial, it failed to provide advance notice to appellant of the predicate offense. While far from desirable, we cannot say that it nullifies the curative effect of the bill of particulars, however, for two reasons. First, as appellant repeatedly argues, his appeal "is not based on notice or lack thereof." Second, the state identified felonious assault as the predicate offense, on the record, before trial.[1] For all of these reasons, we find that the bill of particulars cured the indictment's failure to identify a predicate offense.

---

[1] During the October 13, 2013 plea hearing, the court said, "[t]he charge is that you did cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that was a felony of the first or second

12.

{¶ 29} Appellant also complains that the indictment "contains no mens rea for the offense." The same argument was raised in *State v. Horner,* 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26. In *Horner,* the defendant was indicted on two counts of aggravated robbery, as set forth in R.C. 2911.01(A)(3), which provides that "[n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall * * * [i]nflict, or attempt to inflict, serious physical harm on another." The defendant in that case argued that the indictment was insufficient because "a culpable mental state was not included in the indictment." The court noted that that the aggravated robbery offense does not include proof of a mental state but that the predicate offense, i.e. R.C. 2913.01, does. *Id.* at ¶ 53. The court held that "[a]n indictment that charges an offense by tracking the language of the criminal statute is not defective for failure to identify a culpable mental state when the statute itself fails to specify a mental state." *Id.* at paragraph one of the syllabus.

{¶ 30} In this case, appellant concedes that felony murder is a strict liability offense, i.e. it does not include a mental state. He argues, however, that the rule announced in *Horner* does not apply because the statutes are different. He claims that the aggravated robbery statute in *Horner* "specifically refers to the underlying offense (a theft offense), [which] itself includes a mens rea" whereas the felony murder statute in this case "refers to no particular predicate offense," other than a general reference to "an

---

degree. *I'm presuming it's felonious assault. Is that the felony*?" (Emphasis added.) The prosecutor confirmed that it was.

13.

offense of violence that is a felony of the first or second degree * * *." R.C. 2903.02(B). Appellant continues, "an indictment [of a strict liability offense] indicating no predicate offense, contain[s] no mens rea for the jury, thereby violating the defendant's right to a prosecution by grand jury."

{¶ 31} The state counters that *Horner* "is not limited to statutes in which the [indicted] offense refers to a predicate offense by name, and appellant has offered no language from the case that limits the holding in such a fashion." We agree. In addition, to the extent that appellant suggests that the predicate offense in *Horner* makes specific reference to a mens rea, we note that it does not. That is, no mens rea is set forth in the predicate offense, i.e. R.C. 2913.01(K). Similarly, in the instant case, no mens rea is set forth in the bill of particulars; only reference to "felonious assault, in violation of R.C. 2903.11(A)(2)" is made. Returning to the court's conclusion in *Buehner,* that an indictment need not identify the elements of a predicate offense, we find that, because the felony murder statute does not require proof of a mental state, the absence of any reference to a mental state does not render the indictment defective. *Buehner,* 110 Ohio St.3d 403, 2006-Ohio-4707, 853 N.E.2d 1162, at ¶ 10 and 12; *Horner* at ¶ 53.

{¶ 32} Our decision comports with other similar cases. For example, in *State v. Horton,* 9th Dist. Summit No. 26407, 2013-Ohio-3902, ¶ 16-19, the defendant alleged that his felony murder conviction should be vacated because the indictment failed to charge a mens rea. The Ninth Appellate District rejected the argument, finding that the indictment "was not defective for failure to include a mens rea for felony murder because the indictment tracked the language of Section 2903.02(B) of the Ohio Revised code

14.

which does not include a mens rea." *Id.* ¶ 19, quoting *State v. Benford,* 9th Dist. Summit No. 25298, 2011-Ohio- 564, ¶ 21. *See also State v. Pudelski,* 8th Dist. Cuyahoga No. 100551, 2014-Ohio-1236, ¶ 15 ("In this case, Count 2 of the indictment tracked the language of R.C. 2903.02(B), felony murder, and specified the underlying felony, to wit: felonious assault. Accordingly, it follows that any further identification of the elements of felonious assault was not required under R.C. 2941.14(A), and Count 2 of the indictment properly charged felony murder. *See Horner* at paragraph one of the syllabus ('because the indictment follows the wording of the statute, the indictment is proper')."

**{¶ 33}** Finally, for the record, the predicate offense in this case (felonious assault) includes a mens rea of knowingly. *See* R.C. 2903.11(A)(2) ("No person shall knowingly * * * [c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."). Although appellant does not challenge the jury instructions on appeal, we note that the trial court instructed the jury that, "[b]efore you can find the defendant guilty of the offense of murder, you must find beyond a reasonable doubt that * * * [appellant] did *knowingly cause the death* of [the victim] as a proximate result of the defendant committing an offense of violence, to wit, felonious assault, in violation of Revised Code second 2903.11(A)(2), a felony of the second degree." (Tr. at 207; emphasis added.) The court's instruction was proper.

**{¶ 34}** "The purposes of an indictment are to give an accused adequate notice of the charge, and enable an accused to protect himself or herself from any future prosecutions for the same incident." *State v. Buehner*, 110 Ohio St.3d 403, 2006-Ohio-4707, 853 N.E.2d 1162, ¶ 7. We find that the indictment, when read in conjunction with

15.

the bill of particulars, satisfied those purposes in this case. Notice of plain error is to be taken with the utmost caution, under exceptional circumstances and to prevent a manifest miscarriage of justice. *Long,* 53 Ohio St.2d at 91, 372 N.E.2d 804. We find no evidence of plain error in this case. Therefore, appellant's first assignment of error is not well-taken.

**Appellant's murder conviction is not against the manifest weight of the evidence.**

{¶ 35} Appellant argues that his conviction was against the manifest weight of the evidence. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the fact finder's resolution of the conflicting testimony." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). In determining whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether, in resolving any conflicts in the evidence, the jury clearly lost its way and thereby created such a manifest miscarriage of justice that the conviction must be reversed and a new trial must be ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 36} A conviction should be reversed on manifest weight grounds only in the most "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175. Moreover, "'it is inappropriate for a reviewing court to interfere with factual findings of the trier of fact * * * unless the reviewing court

16.

finds that a reasonable juror could not find the testimony of the witness to be credible.'" *State v. Brown*, 10th Dist. Franklin No. 02AP-11, 2002-Ohio-5345, ¶ 10, quoting *State v. Long*, 10th Dist. Franklin No. 96APA04-511, 1997 Ohio App. LEXIS 416 (Feb. 6, 1997).

{¶ 37} In support of his argument, that his conviction is against the manifest weight of the evidence, appellant requests that "this Court look closely at two facts." First, appellant casts doubt on A.J.'s testimony – that she saw him shoot the victim - because "she could not describe appellant's clothing or the color of his clothing" and because she observed the shooting from "many yards away and through several trees blocking her line of sight."

{¶ 38} The record does not support appellant's argument that trees "blocked" A.J.'s line of sight. Under cross examination, A.J. agreed that "there were some trees between the bench [where A.J. was located] and that point in the street [where appellant was]," but she did not testify that they obscured her view. And, A.J. was specifically asked, "[j]ust to be clear, did you see the defendant shoot [the victim]," to which she answered, "yes." She also testified that she maintained "visual contact" with appellant and his two friends during the entire incident, which she estimated took about two minutes.

{¶ 39} Moreover, despite her inability to recall what appellant was wearing, the jury found A.J.'s testimony credible. The credibility of the witnesses and the weight to be given to their testimony are matters for the trier of facts primarily to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). We extend special deference to the fact finder's credibility determinations because it is the fact finder who has the benefit of

17.

seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. The jury was free to choose which witnesses to credit, including A.J., and how to interpret the evidence before it.

{¶ 40} Appellant also complains that the state failed to charge appellant's friends with any crime, despite the state's contention that their flight demonstrated a consciousness of guilt and despite Detective Anderson's testimony that one of them (Sykes) was in jail (for unidentified reasons). That the state may not have pursued criminal charges, of some sort, against either Sykes or Scott does not undermine the strength of the evidence against appellant. Indeed, appellant does not claim that either was responsible for the victim's murder. Appellant told Detective Anderson that he did not see who shot the victim, and other than to claim that "somebody [else] shot him," he offered no theory, much less evidence as to who that person may have been. By contrast, and in addition to A.J.'s eye-witness testimony, the state put forth evidence that appellant and the victim had a long history of "bad blood" between them, and that their rivalry continued as evidenced by appellant's Facebook posts in the days before the murder and appellant's efforts to conceal those posts after his arrest.

{¶ 41} Having reviewed the evidence in this case, we find that none of the arguments advanced by appellant undermine the jury's ultimate conclusion that the state proved all of the elements of its case against appellant beyond a reasonable doubt.

18.

Therefore, we do not find that his conviction is against the manifest weight of the evidence, and his second assignment of error is not well-taken.

**The court's order of restitution was proper.**

{¶ 42} In his third and final assignment of error, appellant challenges the trial court's order that he pay $960 in restitution to F.H., the victim's mother, to cover the cost of the headstone at the victim's gravesite. Because appellant did not object to the trial court's restitution order at the sentencing hearing, his argument is reviewed on appeal under a plain error standard of review. *State v. Griffin,* 6th Dist. Lucas No. L-11-1283, 2013-Ohio-411, ¶ 43.

{¶ 43} R.C. 2929.18(A)(1) authorizes the trial court to award restitution in an amount based on the victim's economic loss. Before imposing restitution, the trial court "shall consider the offender's present and future ability to pay the amount of the sanction or fine." R.C. 2929.19(B)(5). While a sentencing court is not required to hold a separate hearing when determining whether to impose a financial sanction under these provisions, the record must contain some evidence that the court considered the offender's present and future ability to pay such a sanction. *State v. Flowers,* 6th Dist. Lucas No. L-14-1141, 2015-Ohio-908, ¶ 11-13, citing *State v. Phillips*, 6th Dist. Fulton No. F-05-032, 2006-Ohio-4135, ¶ 18. We look to the totality of the record to determine whether the requirement has been satisfied. *Id*. at ¶ 11.

{¶ 44} Appellant claims that "the record does not show that the trial court considered appellant's future ability to pay when it imposed restitution at the sentencing

19.

hearing." Appellant cites his indigency and minimum 18 year prison sentence as evidence that he has no ability to pay restitution in this matter.

{¶ 45} Prior to ordering restitution, the trial court stated that it had "carefully reviewed" appellant's PSI. The PSI indicates that appellant does not have a high school degree and that his only known employment history involved temporary landscaping work that was court-ordered while appellant was on probation as a juvenile. On the other hand, appellant was shown to be physically strong and in seemingly good health. Although he will not be released from prison before he is 38 years old, there is nothing in the record indicating he will be unable to gain employment at that time. We find that the trial court's determination, that "[d]efendant found to have, or reasonably may be expected to have, the means to pay restitution" is not plain error. *Accord, State v. Donaldson*, 6th Dist. Lucas No. L-11-1264, 2012-Ohio-6064, ¶ 31 (Appellant able to pay restitution where he had a 10th grade education, had held jobs in the past, and was only 41 years old at time of beginning his five year prison sentence).

{¶ 46} Further, contrary to appellant's arguments, the fact that he was indigent and was represented by a public defender does not mean he will not have the future ability to pay restitution. As noted by the state, the determination that a defendant is indigent for purposes of appointed counsel is separate and distinct from a determination that the person is indigent for purposes of paying a mandatory fine or financial sanction. *State v. Adams,* 12th Dist. Clermont Nos. CA2017-03-018, CA2017-03-019, 2017-Ohio-8536, ¶ 28; *State v. Andrews*, 1st Dist. Hamilton No. C-110735, 2012-Ohio-4664, ¶ 29 (Noting that Ohio courts have uniformly held that the appointment of counsel for an indigent

20.

defendant does not prohibit the trial court from imposing a financial sanction because "an offender's ability to pay a fine over a period of time is not equivalent to the ability to pay legal counsel a retainer fee at the outset of the criminal proceedings").

{¶ 47} As the record contains evidence demonstrating the trial court considered appellant's present and future ability to pay, we find that the trial court did not commit plain error in ordering restitution. Appellant's third assignment of error is found not well-taken.

## Conclusion

{¶ 48} For the reasons set forth above, appellant's assignments of error are not well-taken, and the November 9, 2017 judgment of the Lucas County Court of Common Pleas is affirmed. Costs are hereby assessed to the appellant in accordance with App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J. _____

_____
JUDGE

Thomas J. Osowik, J. _____

_____

Christine E. Mayle, P.J. _____
CONCUR.

JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.