[Cite as *State v. Cantrill*, 2020-Ohio-1235.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                          Court of Appeals No. L-18-1047

     Appellee                                    Trial Court No. CR0201701762

v.

Jason Ray Cantrill                              **DECISION AND JUDGMENT**

     Appellant                                   Decided:  March 31, 2020

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Alyssa Breyman, Assistant Prosecuting Attorney, for appellee.

Karin L. Coble, for appellant.

* * * * *

**ZMUDA, P.J.**

{¶ 1} This matter is before the court on appeal from the judgment of the Lucas County Court of Common Pleas, general division, sentencing appellant to an aggregate prison term of 26 years after a jury trial.  Finding no error, we affirm.

## I. Facts and Procedural Background

{¶ 2} Over a two-week period, from March 30 to April 11, 2017, appellant Jason Cantrill,[1] Robert Coulter, and Salena Munoz conducted a series of break-ins in Toledo and Maumee, taking property from the dwellings they entered, with the ultimate goal purchasing illicit drugs. According Munoz and Coulter, Cantrill either exchanged the property with their drug dealer for drugs, or Munoz sold jewelry and other property to pawnshops and gave Cantrill the money, which she then exchanged for drugs. At the time, all three struggled with drug addiction.

{¶ 3} The victims of each break-in reported the crimes to police, and police obtained video of some of the incidents from neighbors' security cameras. The various videos showed a black Jeep Cherokee with the front license plate attached to the grill, as well as individuals approaching the houses, returning after some time with property in hand, and then leaving in the vehicle. Based on the video footage, police could not clearly identify the individuals involved. However, police circulated a description of the black Jeep to patrol officers. One of the victims was a retired police officer, and he discovered a crack pipe lying on the floor of his garage while cleaning up after the break-in. He notified police, who collected the crack pipe from the garage for forensic testing. That testing identified Cantrill's DNA on the crack pipe.

---

[1] Cantrill is a transgender woman. We use her preferred pronouns, "she" and "her."

2.

{¶ 4} On April 12, 2017, police stopped Cantrill's black Jeep Cherokee after noting it fit the description of the vehicle police believed connected to the series of break-ins. Cantrill and Coulter were in the vehicle, with Cantrill at the wheel. Cantrill immediately exited the vehicle and indicated she had no identification. Police secured her in the back of the cruiser for officer safety while they verified her identity. As Coulter exited the passenger side, police saw a gun, and they secured Coulter in the back of a second cruiser. Munoz had been staying with her sister in that neighborhood, and saw the traffic stop. Munoz owned a gun, and reported her gun stolen the previous day. She approached the officers and told them about her gun, with police later determining the gun in the vehicle belonged to Munoz.

{¶ 5} Police seized the gun, and noted it was loaded with a round in the chamber. They searched the vehicle and recovered "a bunch of electronics," two pill bottles (one bearing a victim's name), and a red gas can with the gasoline mixture handwritten on the container. As Cantrill sat in the back of the police cruiser, she spotted Munoz with police, and yelled to Munoz to "blame Coulter." The police cruiser's dashcam recorded Cantrill's words.

{¶ 6} Police interviewed Cantrill that evening, and she denied all knowledge of any burglaries. She also claimed she had not used heroin in four years, but police noted fresh needle marks, with one area so fresh it was bleeding slightly. In a subsequent interview, police showed Cantrill videos recorded by neighbors' security cameras. She

3.

identified Coulter and Munoz as the perpetrators, and claimed the black Jeep belonged to Coulter.

{¶ 7} Coulter initially refused to talk with police, but later spoke with investigators and acknowledged his part in the crimes. Coulter accepted a plea to three counts of a lesser offense of burglary, each felonies of the third degree, and agreed to testify at Cantrill's trial. Munoz also cooperated with the investigation, and reviewed the list of stolen property with police. Munoz added items to the list, and victims later confirmed the additional items as missing but omitted from their initial lists to police. Like Coulter, Munoz accepted a plea to two counts of a lesser offense of burglary, each felonies of the third degree, and agreed to testify against Cantrill.

{¶ 8} On May 3, 2017, Cantrill was indicted in case No. CR0201701762 on three counts of burglary in violation of R.C. 2911.12(A)(2) and (D) in Counts 1, 2, and 3, all felonies of the second degree; one count of improperly handling firearms in a motor vehicle in violation of R.C. 2923.16(B) and (I) in Count 4, a felony of the fourth degree; one count of having weapons while under disability in violation of R.C. 2923.13(A)(2) and (B) in Count 5, a felony of the third degree; and one count of receiving stolen property in violation of R.C. 2913.51(A) and (C) in Count 6, a misdemeanor of the first degree.[2]

---

[2] In case No. CR0201701762, Coulter was indicted on three counts of burglary, felonies of the second degree, one count of improperly handling firearms in a motor vehicle, and one count of receiving stolen property. In that same case, Munoz was indicted on two counts of burglary, felonies of the second degree.

4.

{¶ 9} On May 31, 2017, Cantrill was indicted in case No. CR0201701915 on one count of breaking and entering in violation of R.C. 2911.13(A) and (C), a felony of the fifth degree.

{¶ 10} Cantrill was arraigned and the trial court appointed attorney Julie Bookmiller as counsel.  On September 12, 2017, days before a scheduled trial date, Cantrill asked that her counsel be removed, indicating disagreement over trial strategy. After Bookmiller also requested leave to withdraw, the trial court discharged Cantrill's counsel, continued the trial date, and appointed Jack Viren as counsel.

{¶ 11} On November 21, 2017, Viren asked to withdraw, citing a breakdown in communication between attorney and client, and disagreement over how to proceed with her case.  The trial court granted Viren's request to withdraw, and appointed a third attorney for Cantrill, John Thebes.

{¶ 12} On January 4, 2018, Cantrill filed a motion to dismiss, arguing a defect in the process in proceeding to preliminary hearing after arrest.[3]  The state opposed the motion, as contrary to law, noting the lack of legal authority to support Cantrill's motion.

{¶ 13} On February 8, 2018, on the eve of trial, counsel indicated that Cantrill was "undecided" on her choice of attire for the trial, and she subsequently presented as a

---

[3] Attorney Thebes indicated in the filing that the motion was "written while contemplating *Anders v. California*, 386 U.S. 738," apparently acknowledging the lack of legal basis for Cantrill's argument regarding the remedy of dismissal for her perceived procedural irregularities.  Cantrill does not argue these irregularities in her appeal.

5.

woman at trial.[4]  Up until this date, Cantrill had expressed no preference in proceedings regarding how counsel or the court should address her.  The focus of this pretrial hearing, furthermore, was not gender identity, but Cantrill's assertion that the trial court must dismiss all charges, based on procedural irregularities prior to the May 3, 2017 indictment.   The trial court denied the motion.  Dissatisfied with her trial counsel's motion in support of dismissal, and the trial court's denial of the motion, Cantrill inquired into representing herself at trial.  Cantrill ultimately chose to proceed with appointed counsel.

{¶ 14} On February 12, 2018, the trial court consolidated the two cases, and trial commenced before a jury.[5]  During voir dire and in opening statements, the prosecutor addressed the fact that Cantrill is a transgender woman, and presented as a woman at trial.  At the end of voir dire, the prosecutor probed the issue with the jurors, as follows:

> Prosecutor:  So, ladies and gentlemen, you may have noticed the defendant she is dressed as a woman today.  There will be some mixed testimony that you receive about whether the defendant was dressed as a woman or a man on a particular occasion.  Is there anybody who has such strong feelings about issues of sexual orientation, gender, whether

---

[4] Based on dash-cam video, Cantrill presented as a woman at the time of her arrest.  She remained in custody during the proceedings, receiving credit for 328 days at the time of sentencing.

[5] The single count in case No. CR0201701915 was renumbered as Count 7 for trial.

6.

somebody presents as a man, identifies as a man or a woman that you think it might affect your deliberations in this case? And [prospective juror #22], you brought it up, so I'll ask you.

Prospective Juror #22: I don't think it will affect my deliberations in this case, but.

Prosecutor: Is there anybody else who feels like they would have difficulty with that? Very good. Thank you very much, [prospective juror #22], and ladies and gentlemen.

Defense counsel also addressed the issue during voir dire, stating:

And the first thing that [the prosecutor] brought up that it truly is we'll call it the elephant in the room but it's no secret. It's Jason here is dressed as a woman, and anatomically he's a man, and we will refer to him as a woman in the female tense [sic.], female pronoun during the course of this trial. And much like you mentioned, [prospective juror #22], I believe it was, about we were talking about presumption of innocence, remember that, prosecutor asked you a question, and you said something like, well, he got arrested. Remember that? Yeah. Well, this is my question to you, and I'll address you as a group at least right now. Question is, look, we've had somebody who's gone through the process. He's been arrested, he's been indicted, and you heard the indictment read to you by the judge. And now he is dressed as a woman even though he's a man, and we talk to you about

these lofty concepts like fairness, presumption of innocence, and the question is, you know, we're human beings. Even though we're in a courtroom, we're still human beings. We have this bank of experience and knowledge no matter how old you are, and the question is can you judge this case just on the facts and the evidence, set aside - - even if it bothers you, set aside those human feelings and judge this case, judge her based on the facts and the evidence? That's the question.

If you have a problem with it, it's okay. It's not a big deal. As the judge said, it just may not be the case for you. But now's the time. See, we can't go in – I can't go inside your heart, your head. Now's the time. And if you have a problem with it, raise your hand. Or if you think you need to talk to us in private, raise your hand. And if not, we'll go forward with it. We'll go forward with it. Anybody have a problem going forward with the case the way we have it set up?

Defense counsel used a peremptory challenge to strike prospective juror No. 22. No other prospective juror voiced any opinion on the subject.

{¶ 15} In the beginning of his opening statement, the prosecutor stated:

Earlier we talked about the subject of the defendant. The defendant has requested that at this trial she be referred to using female pronouns. I'm going to do my best to honor that request and respect that. If at some point during the trial I mistakenly refer to the defendant by a male pronoun,

8.

I apologize to the defendant, I apologize to you, the jury. I'm going to do my best. You might hear some evidence from witnesses. They might use different ways to refer to the defendant. We'll try to make clear during the course of the trial that they're speaking about the person who's seated at the defense table.

{¶ 16} No party challenged a seated juror based on bias toward Cantrill over her gender identity, and Cantrill does not raise the issue of juror bias in her appeal. Throughout the trial, however, the prosecutor and defense counsel addressed Cantrill inconsistently, sometimes using her preferred pronouns, and sometimes using male pronouns. The witnesses, also, used male pronouns in referring to Cantrill. The trial court addressed her as "Mr. Cantrill," but also used her preferred pronouns.[6]

{¶ 17} The state presented victim testimony regarding each incident, with each victim recounting similar tales. Each indicated they returned to their homes to find evidence of an intrusion, disarray, and missing property. In three of the instances, the victim indicated they or a family member might have been home at the time, based on their schedules, or feared the perpetrators could still be on the scene.[7] The investigating

---

[6] Cantrill's appellate counsel also proved inconsistent in using her preferred pronouns, which appellate counsel acknowledged during oral argument as an inadvertent mistake.

[7] The trial court provided a lesser-included instruction as to the burglary charges in Counts 1-3, but the jury convicted on the counts as charged. Cantrill does not raise any error regarding lesser-included offenses in her appeal.

9.

officers also testified, including a forensic expert who retrieved Cantrill's DNA from the crack pipe. Finally, Coulter and Munoz testified, pursuant to their plea agreements, that Cantrill was the mastermind of the crimes, and controlled the money obtained from their activities. After their testimony, Coulter and Munoz were each sentenced to community control.

{¶ 18} After considering the testimony, the jury acquitted Cantrill on the weapons under disability charge, but found Cantrill guilty on all other charges. At Cantrill's request, the trial court found the offense of burglary in Count 2 and receiving stolen property in Count 6 merged for purposes of sentencing,[8] and imposed a prison term of 8 years as to each of the three counts of burglary, 13 months as to the count of improperly handing firearms in a motor vehicle, and 11 months as to the count of breaking and entering. The court ordered the sentences to run consecutively to each other, for an aggregate prison term of 26 years. Additionally, the trial court waived costs noting Cantrill's inability to pay, and ordered restitution to the victims totaling $18,762.

---

[8] The sentencing entry indicated dismissal of the charge for receiving stolen property at the state's request, but the transcript of proceedings does not demonstrate any state request to dismiss this charge. Pursuant to *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 27, "[b]ecause R.C. 2941.25(A) protects a defendant only from being punished for allied offenses, the determination of the defendant's guilt for committing allied offenses remains intact, both before and after the merger of allied offenses for sentencing. Thus, the trial court should not vacate or dismiss the guilt determination." No party raised this as an issue on appeal.

10.

## II. Assignment of Error

{¶ 19} Cantrill now appeals the trial court's judgment, asserting the following assignments of error.

Assignment of Error One: The trial court violated Cantrill's Due Process right to a fair trial by committing and permitting discrimination on the basis of sex in violation of Cantrill's right to Equal Protection under the U.S. and Ohio Constitutions.

Assignment of Error Two: Defense counsel rendered ineffective assistance at trial in violation of the Sixth Amendment to the U.S. Constitution and Article for failing to protect Cantrill's right to a trial free from discrimination on the basis of sex and free from improper introduction of other acts evidence.

Assignment of Error Three: The prosecutor's repeated misgendering of Cantrill throughout the trial and throughout closing arguments constituted prosecutorial misconduct.

Assignment of Error Four: The trial court erred in denying the defense's motion for a mistrial after finding the prosecutor improperly vouched for the credibility of witnesses in closing arguments.

Assignment of Error Five: Cantrill was deprived of a fair trial when the trial judge told the jury that Cantrill had been convicted of assault on a peace officer, with no proper purpose and with no limiting instruction.

Assignment of Error Six: The verdicts were not supported by sufficient evidence and fell against the manifest weight of the evidence.

Assignment of Error Seven: The trial court's imposition of consecutive sentences is unsupported by competent, credible evidence.

Assignment of Error Eight: The order of restitution is contrary to law where appellant has no ability to pay restitution.

Assignment of Error Nine: Cumulative error deprived Cantrill of [a] fair trial.

### III. Analysis

### A. Gender Identity Discrimination

{¶ 20} In her first assignment of error, Cantrill argues that the trial court, prosecutor, defense counsel, and witnesses engaged in sex-based discrimination in failing to use her preferred pronouns with consistency. She argues that the conduct of counsel and the trial court constituted state action, and rendered her trial fundamentally unfair. Cantrill argues the misgendering in her case was unlawful discriminatory treatment, rising to the level of structural error, and as a result, she was deprived of a fair trial.

{¶ 21} Cantrill bases her claim of discrimination on federal and state civil rights law, arguing she is a protected class member based on her gender identity. Federal and state civil rights statutes define unlawful discrimination relative to specific types of

prohibited treatment, be it in the workplace, in schools, in housing, or other areas.[9] In cases asserting unlawful discrimination against a transgender person, the plaintiffs have generally relied on the prohibitions against disparate treatment on the basis of sex and/or gender. *See, e.g., Prescott v. Rady Children's Hosp.-San Diego*, 265 F.Supp.3d 1090, 1099 (S.D.Cal.2017) (in denying dismissal of discrimination claims brought under the ACA for harm caused by purposeful misgendering of a transgender child, the court noted the First, Sixth, Seventh, and Eleventh Circuit Courts of Appeals have recognized federal claims on the basis of sex or gender for transgender individuals).

{¶ 22} Whether a transgender person may sue under Title VII for discrimination on the basis of sex, however, is presently pending before the United States Supreme Court, and unrelated to the issue now before us on appeal.[10] The issue presented by

---

[9] *See, e.g.*, Title VII of the Civil Rights Act of 1964, Section 2000e et seq., Title 42, U.S.C. (Title VII), Title IX of the Educational Amendments of 1972, 20 U.S.C. 1681 et seq. (Title IX), 42 U.S.C. 3601, et seq. (Fair Housing Act), and R.C. 4112.02 et seq. (Ohio Civil Rights Act). The city of Toledo has also enacted specific prohibitions against discrimination against individuals because of their gender identity. *See* Toledo Municipal Code 554.02 (employment), Toledo Municipal Code 544.03 (real estate and housing), Toledo Municipal Code 554.04 (access to service in business establishments), and Toledo Municipal Code 554.05 (accommodations). The city also designated certain crimes, committed because of a victim's gender identity, as hate crimes. *See* Toledo Municipal Code. 555.01.

[10] The Sixth Circuit Court of Appeals recently recognized a Title VII claim for discrimination on the basis of sex in the workplace in *E.E.O.C. v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560 (6th Cir.2018), *cert. granted in part sub nom. R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*, 139 S.Ct. 1599, 203 L.Ed.2d 754 (2019). The United States Supreme Court has not yet ruled on the appeal in *R.G. & G.R. Harris Funeral Homes* as of the date of our ruling.

13.

Cantrill is not one of unlawful discrimination in the workplace or in housing. Instead, she frames the issue as an Equal Protection claim, arising from her status as a member of a protected class under the civil rights laws, arguing her case is analogous to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.69 (1986), as extended by the Ninth Circuit Court of Appeals in *SmithKline Beecham Corp. v. Abbott Labs.*, 740 F.3d 471 (9th Cir.2014).

{¶ 23} Cantrill's reasoning contains large gaps, with little to link her claim of unlawful discrimination, normally asserted in a civil proceeding, to the rights guaranteed in a criminal proceeding. Her reference to *SmithKline* as extending *Batson*, furthermore, does little to bring the concept into better focus, as the issue in *Batson*, or even *SmithKline*, had nothing to do with allegations of discrimination against a party during the proceeding.

{¶ 24} The matter in *Batson* concerned equal protection and a right to be tried by a jury of one's peers, with the court holding "a State denies a black defendant equal protection when it puts him on trial before a jury from which members of his race have been purposefully excluded[.]" *See Batson* at the syllabus. We previously considered the history leading to *Batson*, noting:

> In 1875, Congress prohibited the race-based exclusion of any qualified citizen from jury service. See Act of Mar. 1, 1875, ch. 114, Section 4, 18 Stat. 336 (codified as amended at Section 243, Title 18, U.S. Code [1948] ). Four years later, the Supreme Court of the United States

held that a state statute excluding African-Americans from jury service violated a defendant's right to equal protection. *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879). Over time, the court continued to issue decisions directed at "[eradicating] racial discrimination in the procedures used to select the venire from which individual jurors are drawn." *Batson v. Kentucky*, 476 U.S. 79, 85, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Despite the court's attempts to address discrimination in the selection of the venire, "prospective African-American jurors continued to be excluded from [petit] jury panels through the use of peremptory challenges." *State v. Gowdy*, 88 Ohio St.3d 387, 391, 727 N.E.2d 579 (2000), citing *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed. 2d 759 (1965). Thus, in 1986, the court issued its decision in *Batson*, which applied the principles annunciated by the court regarding the selection of the venire to the selection of the petit jury. *Batson* at 88, 106 S.Ct. 1712. In so doing, the court directed that "the State may not draw up its jury lists pursuant to neutral procedures but then resort to discrimination at 'other stages in the selection process.'" *Id.*, quoting *Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 97 L.Ed. 1244 (1953). The court went on to hold that the Equal Protection Clause forbids prosecutors from challenging potential jurors solely on account of their race or on the assumption that African-American

jurors as a group will be unable to impartially consider the state's case against an African-American defendant. *Id.* at 89, 106 S.Ct. 1712. *State v. Singer*, 6th Dist. Lucas No. L-17-1309, 2019-Ohio-1922, ¶ 9-10, *appeal not allowed*, 157 Ohio St.3d 1405, 2019-Ohio-3731, 131 N.E.3d 74, ¶ 9-10.

{¶ 25} In *SmithKline*, the issue was exclusion of the only self-identified gay member of the venire, where the major dispute between the parties in a civil suit concerned the pricing of HIV medications, "a subject of considerable controversy in the gay community." *SmithKline*, 740 F.3d at 474. After reviewing the history of oppression against gays and lesbians, and their changing status under the law, the court found that *Batson* applied to actions that purposefully excluded this group from jury service based solely on their sexual orientation, holding:

> Strikes exercised on the basis of sexual orientation continue this deplorable tradition of treating gays and lesbians as undeserving of participation in our nation's most cherished rites and rituals. They tell the individual who has been struck, the litigants, other members of the venire, and the public that our judicial system treats gays and lesbians differently. They deprive individuals of the opportunity to participate in perfecting democracy and guarding our ideals of justice on account of a characteristic that has nothing to do with their fitness to serve.

*SmithKline* at 485.

16.

**{¶ 26}** In this instance, Cantrill invokes *Batson* as a talisman, without any reasoning to extend the law beyond jury selection, arguing instead that misgendering resulted in a structural error because *Batson* violations constitute structural error. What is missing in Cantrill's argument, however, is a clear articulation of the exact, legal right she believes is implicated, vis-à-vis *Batson*. Furthermore, Cantrill does not assert that the state or the trial court acted in any discriminatory manner to exclude certain members of the venire from jury service.

**{¶ 27}** The discriminatory conduct argued, in this case, is misgendering by counsel and the trial court in referring to Cantrill. Most recently, the Fifth Circuit Court of Appeals considered a defendant's request to be referred to by preferred pronouns, and both the majority and dissent noted the lack of any legal authority compelling or preventing a court from honoring such a request. In *United States v. Varner*, 948 F.3d 250 (5th Cir.2020), the defendant filed a motion to amend her judgment of conviction to reflect her legal name change from Norman Varner to Kathrine Nicole Jett. She also filed a letter, requesting the court address her using female pronouns in the proceeding. *Varner* at 252.

**{¶ 28}** The majority denied each of Varner's requests, finding no jurisdiction to amend the judgment entry and considering the request to use preferred pronouns lacked any basis in federal statute or rule. The majority also construed the request broadly, as seeking a mandate to the district court and government to recognize her expressed gender identity. *Id.* at 254. In refusing Varner's request, the majority stated concern for the

17.

precedent that could be set in addressing a litigant according to their gender identity, especially in the hypothetical case where gender might be at issue. *Id.* at 256.

{¶ 29} The dissent in *Varner*, however, reached a different conclusion, stating:

In my view, Varner is simply requesting that *this court, in this proceeding*, refer to Varner using her preferred gender pronouns. Not only is this the most faithful interpretation of her motion given the language she uses, it is also the narrowest. * * *

If it were necessary to write more and use pronouns to refer to Varner, I would grant Varner the relief she seeks. As the majority notes, though no law compels granting or denying such a request, many courts and judges adhere to such requests out of respect for the litigant's dignity.

(Emphasis sic.) (Citations omitted.) *Varner*, 948 F.3d at 260, Dennis, C.J., dissenting.

{¶ 30} We agree with the dissent's view, that using an individual's preferred pronouns demonstrates respect for that person's dignity, regardless of what the law may require or prohibit. There is no place in our judicial system for malice, disparagement, or intentional disrespect toward any party, witness, or victim, and this includes improper treatment arising from a bias toward a transgender person.

{¶ 31} Cantrill does not argue conduct arising from any overt bias, however. At best, she argues conduct that was careless or thoughtless, claiming the cumulative result of misgendering created structural error. While it is conceivable that misgendering might

18.

be so overt, malicious, and calculating that it prevents a fair trial, Cantrill fails to demonstrate that this is that case. Even if we acknowledged that the attorneys and trial court acted carelessly or thoughtlessly in misgendering Cantrill, more than careless or thoughtless treatment is required to create structural error.

{¶ 32} "The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial. Thus, the defining feature of a structural error is that it 'affect[s] the framework within which the trial proceeds,' rather than being 'simply an error in the trial process itself.'" *Weaver v. Massachusetts*, 137 S.Ct. 1899, 1907, 198 L.Ed.2d 420, 198 L.Ed.2d 420 (2017), citing *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Structural error is not determined on a case-by-case basis, as "a constitutional error is either structural or it is not." *Neder v. United States*, 527 U.S. 1, 14, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999).

{¶ 33} Courts have identified a "very limited class" of structural errors to "include denial of counsel of choice, denial of self-representation, denial of a public trial, a defective reasonable-doubt instruction, racial discrimination in selection of the grand jury, and a biased trial judge." *State v. Jones*, 1st Dist. Hamilton No. C-170358, 2018-Ohio-4754, 124 N.E.3d 439, ¶ 20, *motion to certify allowed*, 155 Ohio St.3d 1418, 2019-Ohio-1315, 120 N.E.3d 865, ¶ 20, citing *United States v. Davila*, 569 U.S. 597, 611, 133 S.Ct. 2139, 186 L.Ed.2d 139 (2013); *see also State v. Hill*, 92 Ohio St.3d 191, 199, 749 N.E.2d 274 (2001).

19.

{¶ 34} In considering a claim of structural error, the threshold inquiry is whether the claimed error "'involves the deprivation of a constitutional right.'" *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 18, quoting *State v. Issa*, 93 Ohio St.3d 49, 74, 752 N.E.2d 904 (Cook, J., concurring). While Cantrill employs words like "Batson," "state actor," and "equal protection," she fails to identify any deprivation of a constitutional right through inadvertent misgendering. Instead, in failing to allege purposeful conduct, she acknowledges only inadvertence, coupled with a sincere attempt by the prosecutor to treat Cantrill with the dignity owed to her as a human being. Her argument of structural error, accordingly, fails, and we find her first assignment of error not well-taken.

### B. Ineffective Assistance of Counsel

{¶ 35} In her second assignment of error, Cantrill argues her trial counsel was ineffective in failing to preserve her right to a discrimination-free trial, resulting in structural error. Additionally, Cantrill argues her trial counsel was ineffective in permitting the introduction of improper other acts evidence, consisting of the trial court's statement to the jury that Cantrill had previously been convicted of assault on a police officer.

{¶ 36} We review a claim of ineffective assistance of counsel using a two-part test. "First, there must be a determination as to whether there has been a substantial violation of any of defense counsel's essential duties to his client. Next, and analytically separate from the question of whether the defendant's Sixth Amendment rights were

20.

violated, there must be a determination as to whether the defense was prejudiced by counsel's ineffectiveness." *State v. Bradley*, 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373 (1989), quoting *State v. Lytle*, 48 Ohio St.2d 391, 396-397, 358 N.E.2d 623 (1976), *vacated in part on other grounds*, 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154 (1978); *see also Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 37} Under the first part of the test, we must determine whether trial counsel's "representation fell below an objective standard of reasonableness." *Bradley* at 142, citing *Strickland* at 687-688. Our review is highly deferential, with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.*, quoting *Strickland* at 689.

{¶ 38} Even if we determine that trial counsel's performance was ineffective, reversal will only be granted if counsel's error resulted in prejudice. *Bradley* at 142, citing *Strickland* at 691. Therefore, a defendant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Bradley* at 142, quoting *Strickland* at 694.

{¶ 39} As previously addressed relative to Cantrill's first assignment of error, although trial counsel was careless in inconsistently using her preferred pronouns, and failed to correct himself or others when they misgendered Cantrill, the misgendering did not deprive Cantrill of any constitutional right. Because Cantrill relies on a finding of

21.

structural error to demonstrate prejudice, and does not otherwise identify any resulting prejudice to support her claim of ineffective assistance of counsel, her argument regarding ineffective assistance arising from misgendering is without merit.

{¶ 40} Cantrill next argues that her trial counsel failed to object to "other acts" evidence, and failed to request a limiting instruction, constituting ineffective assistance of counsel. This claim is similar to the claim raised in her fifth assignment of error. In arguing ineffective assistance of counsel, however, Cantrill fails to address the issue of prejudice, presenting no argument that, but for her counsel's errors, a different result would have been obtained. With no argument as to prejudice, we find no support for ineffective assistance of counsel resulting from "other acts" evidence.

{¶ 41} Accordingly, Cantrill's second assignment of error is not well-taken.

### C. Prosecutorial Misconduct

{¶ 42} Cantrill next argues prosecutorial misconduct, based on repeated misgendering by the prosecution during trial and closing arguments, and again relying on her argument of an unfair trial due to sex discrimination.

{¶ 43} In considering claims of prosecutorial misconduct, our focus is on "the fairness of the trial, not the culpability of the prosecutor." *State v. Talley*, 2016-Ohio-8010, 74 N.E.3d 868, ¶ 33 (6th Dist.), citing *State v. Lott*, 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990). In determining whether prosecutorial misconduct occurred, we must first consider whether remarks were improper, and if we find improper remarks, whether those remarks prejudiced the accused's substantial rights. *State v. Davis*, 116 Ohio St.3d

22.

404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 231, citing *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).

{¶ 44} As addressed relative to Cantrill's first assignment of error, the prosecutor's inconsistent use of her preferred pronouns was careless and inadvertent, but in no way resulted in prejudice to her substantial rights. Indeed, the record clearly demonstrates that the prosecutor, especially, made a sincere effort to treat Cantrill with dignity, and clearly conveyed this sentiment to the jury. Cantrill references no part of the record that demonstrates otherwise.

{¶ 45} In arguing that misgendering was "so pervasive as to render her trial unfair," Cantrill also acknowledges, "[n]o court has held that discriminatory statements by a prosecutor constitute structural error." Cantrill asks this court to find, for the first time, that inadvertent discriminatory statements should be deemed as prosecutorial misconduct, requiring a new trial. Despite her request to do so, we shall not make new law in this area. We find her third assignment of error not well-taken.

### D.  Mistrial

{¶ 46} In her fourth assignment of error, Cantrill argues the trial court erred in failing to grant her motion for mistrial, arguing the trial court entered a finding that the prosecutor improperly vouched for the credibility of witnesses in closing arguments, and therefore, a mistrial was required. In response, the state argues that Cantrill identifies no improper statements, and the trial court determined that no improper vouching occurred.

23.

{¶ 47} A mistrial is only proper "when the ends of justice so require and a fair trial is no longer possible." (Citations omitted.) *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991). "A mistrial is an extreme remedy[.]" *State v. Rossbach*, 6th Dist. Lucas No. L-09-1300, 2011-Ohio-281, ¶ 39, citing *Franklin*, at 127. We review a trial court's decision denying a motion for mistrial for an abuse of discretion. *State v. Sage*, 31 Ohio St.3d 173, 182, 510 N.E.2d 343 (1987).

{¶ 48} Where the motion is based on claims of prosecutorial misconduct, we "must undertake a due process analysis to determine whether the conduct of the prosecutor deprived the defendant of [her] due process right to a fair trial." *State v. Saunders*, 98 Ohio App.3d 355, 358, 648 N.E.2d 587 (6th Dist.1994), citing *State v. Johnston*, 39 Ohio St.3d 48, 60, 529 N.E.2d 898 (1988). In determining whether prosecutorial misconduct occurred, we must first consider whether remarks were improper, and if we find improper remarks, whether those remarks prejudiced the accused's substantial rights. *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 231, citing *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).

{¶ 49} Here, Cantrill argues the trial court made a finding of improper vouching by the prosecutor during his closing argument. "Vouching occurs when the prosecutor implies knowledge of facts outside the record or places his or her personal credibility in issue." *Davis* at ¶ 232, citing *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 117. A complete review of the record demonstrates no such finding. Instead, the trial court first raised the issue with counsel, in-chambers, as follows:

24.

During your rebuttal close, Mr. Wood, there were a couple of times you referenced the defendant lying, and you vouched for the veracity of Ms. Munoz and Mr. Coulter. My understanding of the law is that that is prosecutorial misconduct, as the State of Ohio may not vouch for the credibility of any witness. And I don't know how to fix that.

{¶ 50} In response, the prosecutor indicated he based all statements on the evidence, drawing proper inferences from the facts, as demonstrated by the evidence. Examples of his statements included the following, as to the having weapons while under disability charge:

So, ladies and gentlemen, Salena Munoz testified that she walked past this traffic stop, and you can year her voice, you even hear her spell her name. You know Salena is right out there. She testified the defendant's in the car, windows up. She can't hear [her] voice. And poor Salena, she's just broken up with [Cantrill], and she sees [her] mouthing words to her, and what does she think [she']s saying, I love you. But what is [she] actually saying? Listen for [her] voice.

[video played for jury]

There it was. Between 1:45 and 1:50, blame it on Bobby.

There it is again. About 3 minutes and 44 seconds into the video.

Listen, [she] says it quietly.

Again, at 3 minutes and 57, blame it on Bobby

Again at 3 minutes and 56 seconds, say Bobby took it.

4 minutes and 44 seconds, Bobby did it. Listen to it again. It's quiet.

There it is again, 4 minutes and 49 seconds, blame it on Bobby.

Blame it on Bobby.

So, question is did the defendant know that that gun was in there. There's this weird thing about the truth. Truth is the truth. It doesn't change. And if Bobby was the person who took that gun, the defendant doesn't need to tell Salena that. Salena already knows it, because it's the truth. But the reason the defendant is sitting in the back seat of that car saying over and over again, blame it on Bobby, say Bobby took it, is because it's not the truth. It's a lie. It's a lie that the defendant is about to tell the police. And [she] needs to get Salena on board to confirm [her] lie. If it was the truth, [she] doesn't need to tell her because it's the truth.

As to the illegal transport charge, the prosecutor stated:

And the defendant says, even admitted to the police, I knew Bobby had the gun that day. The defendant just said, oh, I didn't know he had it in the car. But really, come on.

* * *

So, the last thing we've come to. Did the defendant know that it was in there. Yes, [she] did. We've got the Salena - - or the testimony of Salena, testimony of Bobby, the defendant was always taking this handgun;

[she] always had it on [her]; [she] had to control everything. The defendant knew that [she] was transporting that firearm on April 12th of 2017. All the elements are checked off, and it is proved beyond a reasonable doubt.

Finally, the prosecutor summed up testimony regarding ownership of the Jeep:

Now, the defendant said – oh, that's small. The defendant said that that Jeep is Bobby's Jeep. The defendant said when [she] talked to the police that April 12th was the first time [she] had ever driven that Jeep. Bobby and Salena, they said it was Jason's Jeep. They said that Jason bought the Jeep from a guy named Bob Pratt. And Bob Pratt came in to testify. Bob Pratt's not an accomplice. Bob Pratt wasn't at these houses. What did Bob Pratt say? Bob Pratt said he sold the Jeep to the defendant, and in fact he seen the defendant driving it after he sold it. Get rid of those. Bobby and Salena's testimony matches the other evidence in this case.

Here's another one. The defendant said to the police officers during [her] interview that Bobby and Salena were the ones committing these burglaries. Bobby and Salena said, Jason was with us when we committed these burglaries. They didn't deny that they had committed them. Bobby did the first time, then he changed and he told the truth. He lied to Detective Dorner on the day of his arrest, and later he told Detective Sharer I was there. Bobby said Jason was there. Salena said Jason was there. And the evidence we showed was that three people were at [J.B.'s] house.

You can watch that video. It's not two. It's not Bobby and Salena. It's three. Bobby and Salena and the defendant Jason Cantrill. Which means that when the defendant says that Bobby and Salena are the two committing these burglaries, [she] got caught again. It's another lie.

{¶ 51} The trial court directed counsel to research the issue and provide legal authority over the lunch break. When the proceedings resumed, prior to the jury's return, the trial court stated the following:

After I released the jury after arguments, I brought to counsel's attention a concern I had not with what was argued, but how it may be perceived by the jury, and specifically there were references made during closing arguments that individuals were telling the truth or not telling the truth. And out of an abundance of caution I brought it to the attention of counsel and asked them to do research over the lunch hour * * *.

The prosecutor presented relevant authority to support his position of proper inference, and argued:

[T]here were extensive references to the facts prior to any discussion of a conclusion of whether the defendant could have been lying to the police or whether Ms. Munoz or Mr. Coulter would have been telling the truth. The larger standard well established in Ohio law is that prosecutors are entitled to considerable latitude in what the evidence has shown and what reasonable inferences may be drawn. * * *.

28.

That being said, Your Honor, it's the state's position that it was firmly rooted in the evidence, that there was no objection during the closing statement that would have allowed the state to curtail its argument before it became an extensive comment on the evidence. And that any error created would be resolved by the state's proposed curative instruction which is drawn in large part from already - - from various portions of the jury instructions.

{¶ 52} Cantrill's trial counsel presented no argument in response, but instead argued in favor of stronger language in the curative instruction, without success. After the trial court adopted the prosecutor's proposed, curative instruction, Cantrill's counsel requested a mistrial, arguing generally that the prosecutor's closing argument prevented a fair trial. Trial counsel identified no remarks that constituted improper "vouching," however, referring to vouching "inadvertently done" that might "potentially taint the jury."

{¶ 53} In denying a mistrial, the trial court stressed that he raised the issue, "not because there was something done by the prosecutor in his closing argument that * * * negatively affected [Cantrill's] right to a fair trial." Instead, the trial court raised the issue in an abundance of caution, based on "a suggestion" that individuals were telling the truth or not.

{¶ 54} As previously noted, we must first consider whether remarks were improper. *Davis*, 116 Ohio St.3d 414, 2008-Ohio-2, 880 N.E.2d 31, at ¶ 231, citing

*Smith*, 14 Ohio St.3d at 14. Cantrill, however, identifies no remarks for our review, relying instead on the trial court's initial characterization of "vouching," subsequently retracted. Pursuant to App.R. 12(A)(2), we "may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R.16(A)."

{¶ 55} Based on the entirety of the closing argument, we find the prosecutor tied his statements to the evidence presented at trial, with any "suggestion" of vouching addressed through a curative instruction, which we presume a jury has followed. *State v. Hodgkinson*, 6th Dist. Huron No. H-14-012, 2015-Ohio-2678, ¶ 18. Moreover, even if the statements were improper, Cantrill presents no argument regarding any claimed prejudice arising from these statements. Accordingly, considering the entire record, including the trial court's curative instruction, we find the trial court did not abuse its discretion in denying Cantrill's motion for a mistrial. We find her fourth assignment of error not well-taken.

### E. Other Acts

{¶ 56} In her fifth assignment of error, Cantrill argues the trial court improperly told the jury, during the trial and during final instructions, that the defense was stipulating to a prior conviction for an offense of violence, assault on a peace officer, as an element of the having weapons while under disability charge. She argues that the stipulation of a prior offense was sufficient, without mention or description of the specific offense.

30.

Furthermore, because the trial court failed to provide a limiting instruction, she argues that the trial court introduced prejudice into the trial, requiring reversal as to all convictions.

{¶ 57} Cantrill does not clearly present an "other acts" error for our review. Specifically, she argues that "the trial judge" introduced the "evidence" of her prior offense. In this case, the charge of having weapons while under disability necessitated proof of a prior charge, as an element of that crime. *See* R.C. 2923.13(A)(2). The state did not need to present evidence of the prior charge, however, because the parties stipulated to that element of the offense. The trial court accepted the stipulation. Then, in front of the jury, the trial court described the prior offense, stating:

> Ladies and gentlemen of the jury, the State of Ohio and the
> defendant Jason Cantrill have stipulated that the State has established
> beyond a reasonable doubt that the defendant had knowingly been
> convicted of assault on a peace officer, a felony of the fourth degree, in
> violation of Revised Code Section 2903.13.

The defense neither objected nor requested a limiting instruction, and therefore waived all but plain error. (Citation omitted.) *State v. Hartman*, 93 Ohio St.3d 274, 286, 754 N.E.2d 1150 (1994). Plain error is error or defect "affecting substantial rights." Crim.R. 52(B).

{¶ 58} Clearly, the state did not introduce 404(B) evidence, pursuant to the rule, with no notice of intent to use such evidence and no testimony of Cantrill's prior conduct.

31.

Instead, the information was conveyed to the jury by the trial court. In examining the record, we cannot determine whether the trial court read from the parties' agreed-upon statement or added its own detail to the stipulation. There is no stipulated exhibit of record, establishing the disability element. Additionally, based on the uniformity of the statement offered during the admission of exhibits and in the written jury instructions, it is possible the parties provided agreed-upon language for the trial court to convey. The record simply provides no clarity on the matter.

{¶ 59} Nevertheless, the state concedes that providing specific details of the stipulated offense is improper, relying on *State v. Creech*, 150 Ohio St.3d 540, 2016-Ohio-8440, 84 N.E.3d 981, citing *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). In *Creech*, the Ohio Supreme Court determined a stipulation to a prior conviction was sufficient evidence to satisfy the status element for the weapons under disability charge. *Creech* at ¶ 36. Therefore, the state may not reject that stipulation in favor of presenting evidence "establishing the name and nature" of a defendant's prior convictions. *Id.* The court determined that such evidence could be unfairly prejudicial where it "arouses the jury's emotional sympathies, evokes a sense of horror, or appeals to an instinct to punish[.]" *Id.*, citing *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 743 N.E.2d 890 (2001) (additional citation omitted.).

{¶ 60} While acknowledging that the inclusion of details with the stipulation was improper, we do not find this error constituted plain error. "'To rise to the level of plain error, it must appear on the face of the record not only that the error was committed, but

32.

that except for the error, the result of the trial clearly would have been otherwise.'" *State v. Baker*, 6th Dist. Sandusky No. S-15-014, 2016-Ohio-3094, ¶ 8, quoting *State v. Bock*, 16 Ohio App.3d 146, 150, 474 N.E.2d 1228 (12th Dist.1984). Plain error is "an obvious error * * * which, if allowed to stand, would have a substantial adverse impact on the integrity of and public confidence in judicial proceedings." *State v. Bowman*, 144 Ohio App.3d 179, 190, 759 N.E.2d 856 (12th Dist.2001), citing *State v. Craft*, 52 Ohio App.2d 1, 7, 367 N.E.2d 1221 (1st Dist.1977).

{¶ 61} In arguing plain error, Cantrill requests review of the record without articulating how the trial court's mention of an unrelated offense, lacking specific details, affected the outcome of her trial. She advances no argument that the jury's hearing the name of the prior offense aroused sympathies, evoked horror, or appealed to an instinct to punish. *See Creech*, 150 Ohio St.3d 540, 2016-Ohio-8440, 84 N.E.3d 981, at ¶ 36 (citations omitted.). As the state argues, the jury acquitted Cantrill on the charge for having weapons while under disability, and the prior offense, revealed by the trial court, was nothing like the offenses for which the jury entered guilty verdicts. Indeed, the jury's acquittal best demonstrates the lack of prejudice in this instance, as it can hardly be deemed prejudicial if the disclosure of the nature of Cantrill's prior offense fails to result in conviction on the charge for which it was proffered.

{¶ 62} "In determining whether to grant a new trial as a result of the erroneous admission of evidence under Evid.R. 404(B), an appellate court must consider both the impact of the offending evidence on the verdict and the strength of the remaining

evidence after the tainted evidence is removed from the record." *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, syllabus. Here, if we set the improper remarks aside, the remaining evidence in support of Cantrill's guilt as to the other charges is considerable. Accordingly, we do not find that the trial court's naming of the prior offense affected Cantrill's substantial rights, and we find her fifth assignment of error not well-taken.

### F. Sufficiency and Manifest Weight

{¶ 63} Cantrill next challenges both the sufficiency and the weight of the evidence in her sixth assignment of error. While she combines argument as to sufficiency and manifest weight, "the two are different legal concepts" and require a separate analysis. *State v. Rutledge*, 6th Dist. Lucas No. L-12-1043, 2013-Ohio-1482, ¶ 7, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 64} "When a defendant challenges the sufficiency of the evidence, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Bies*, 74 Ohio St.3d 320, 324, 658 N.E.2d 754 (1996), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1996). A sufficiency inquiry tests the adequacy of the evidence. *Rutledge* at ¶ 8, citing *Thompkins* at 386.

{¶ 65} "In contrast, a manifest-weight challenge questions whether the state has met its burden of persuasion." *State v. Boles*, 190 Ohio App.3d 431, 2010-Ohio-5503,

34.

942 N.E.2d 417, ¶ 76 (6th Dist.), citing *Thompkins* at 387. In considering this challenge, we sit as a "thirteenth juror." We review the record, weigh the evidence and all reasonable inferences, assess the credibility of witnesses, and we must determine whether, in resolving conflicts in the evidence, the jury lost its way and created a manifest miscarriage of justice, necessitating reversal and a new trial. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 66} Cantrill first challenges her conviction for breaking and entering. Proof of this offense requires evidence showing Cantrill trespassed into an unoccupied structure, by force, stealth, or deception, with a purpose to commit a theft offense. R.C. 2911.13(A). In challenging her conviction for breaking and entering, Cantrill addresses only the identity element. Because Cantrill fails to argue any other issue, we restrict our review to the sufficiency and weight of the evidence establishing identity, as permitted by App.R.12(A)(2) and 16(A)(7).

{¶ 67} Cantrill concedes that police retrieved a crack pipe from the garage containing her DNA, but argues the state presented insufficient evidence, tying her to the crime. Cantrill proposes that because she shared the crack pipe with Coulter, it is "reasonably possible that Coulter left the crack pipe with [her] DNA on it in the garage." She also notes the lack of any testimony from Coulter and Munoz regarding the break-in.

{¶ 68} At trial, the state presented the DNA evidence from an item retrieved from the scene after the break-in. This type of evidence, introduced through expert testimony, is sufficient to identify Cantrill as the person who entered the garage. In *State v. Merritt*,

35.

6th Dist. Fulton No. F-12-009, 2013-Ohio-4834, we considered whether a water bottle retrieved from the scene, containing a defendant's DNA, was sufficient evidence of identity despite being the only evidence linking the defendant to the crime. Applying the sufficiency standard, we determined that expert testimony, linking the DNA evidence to the defendant, was sufficient to demonstrate the defendant was present at the scene of crime. *Merritt* at ¶ 11.

{¶ 69} Other jurisdictions have found left-behind DNA to be sufficient evidence of identity. *See, e.g., State v. Lawhorn*, 3d Dist. Paulding Nos. 11-04-19, 11-04-20, 2005-Ohio-2776 (DNA on beer bottles left in the garage was sufficient to demonstrate defendant's presence at the time of the break-in); *State v. Brown,* 8th Dist. Cuyahoga No. 98881, 2013-Ohio-2690 (evidence sufficient where part of shirt left behind in the home contained defendant's DNA as a major contributor); *State v. Crabtree*, 9th Dist. Summit No. 24946, 2010-Ohio-2073 (where victim could not identify intruder, but struck intruder with his gun, DNA from the gun was sufficient to place defendant at the scene); *State v. Stevens*, 85 N.E.3d 119, 2017-Ohio-498 (12th Dist.) (bloody bandage left behind, containing defendant's DNA, sufficient to demonstrate defendant was in the store).

{¶ 70} The state also relied on additional evidence, beyond DNA, in identifying Cantrill as the perpetrator of breaking and entering. The state presented evidence demonstrating Cantrill in possession of property belonging to the victim, about two weeks after the break-in, after police stopped her while driving the black Jeep. Testimony of the prior owner of the Jeep and Cantrill's codefendants established

36.

Cantrill's ownership of the vehicle. The victim of the break-in also positively identified the property as his, taken from his garage. Based on this record, therefore, we do not find the jury lost its way in determining Cantrill was the person who entered the garage and took the victim's property.

{¶ 71} Cantrill next argues that there was no evidence showing she "knowingly" permitted Coulter to have a firearm in the vehicle, a necessary element of the offense. Cantrill was convicted of violation of R.C. 2923.16(B), which provides, "No person shall knowingly transport or have a loaded firearm in a motor vehicle in such a manner that the firearm is accessible to the operator or to any passenger without leaving the vehicle." Again, Cantrill challenges a single element, and argues only the sufficiency.

{¶ 72} The entirety of Cantrill's argument regarding this charge consists of two sentences, with neither legal authority nor substantive argument. She merely articulates "no evidence" of the "knowingly" element, reiterated as "insufficient evidence" that "she knew that Coulter would have a firearm in the vehicle." Therefore, we restrict our review to the sufficiency of evidence as to the "knowingly" element. *See* App.R.12(A)(2) and 16(A)(7).

{¶ 73} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). Unless a defendant admits their knowledge, this element must be determined based on the surrounding facts and circumstances. *State v. Gonzales*, 6th Dist. Wood No. WD-10-063, 2012-Ohio-1876, ¶ 13, citing *State v. Huff*,

37.

145 Ohio App.3d 555, 563, 763 N.E.2d 695 (1st Dist.2001). "As such, the test for whether a defendant acted knowingly is subjective, but it is determined by objective criteria." *Gonzales* at ¶ 13, citing *State v. Elliot*, 104 Ohio App.3d 812, 821, 663 N.E.2d 412 (10th Dist.1995).

{¶ 74} Here, police recovered the gun from the passenger seat of the Jeep, and Coulter testified that Cantrill gave it to him after she was pulled over. Munoz testified that she owned the gun, but it had been stolen from her. Furthermore, she stated that Cantrill always carried the gun, and would never let Coulter or Munoz hold it unless she was driving. Finally, Cantrill told police that she knew Coulter had the gun, but denied she knew he brought it into the vehicle. Considering this evidence, the state presented sufficient evidence to satisfy this element of the offense.

{¶ 75} Cantrill next argues that the convictions on all three counts of burglary are against the manifest weight of the evidence, based on the credibility of her two codefendants. She presents this issue in a single, conclusory sentence, as follows:

> For these convictions, Cantrill requests this Court review the entire record, including the credibility of the two codefendants, and find that the convictions are against the manifest weight of the evidence.

{¶ 76} It is unclear from this "argument" just what Cantrill wishes us to consider within the record, and what she actually challenges. While she directs us to review "the entire record," moreover, "[i]t is not the duty of this court to search the record for evidence to support an appellant's argument as to alleged error." (Citations omitted.)

38.

*Roberts v. Hutton*, 152 Ohio App.3d 412, 2003-Ohio-1650, 787 N.E.2d 1267, ¶ 18 (10th Dist.). Nevertheless, based on a generous reading, it appears Cantrill argues her two codefendants were not credible witnesses, in the broadest sense.

{¶ 77} The offense of burglary is defined at R.C. 2911.12(A)(2) as follows:

> No person, by force, stealth, or deception, shall * * * [t]respass in an occupied structure * * * that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense[.]

At trial, the state presented evidence as to each element of the offense, as it related to the three burglary charges. In addition to video of Cantrill's Jeep and recovery of property in the vehicle belonging to one of the burglary victims, the state presented testimony of Cantrill's codefendants, with other testimony corroborating some of the codefendant testimony.

{¶ 78} While Cantrill requests we review "the entire record" without any legal analysis to support her implication that her codefendants' credibility requires a finding that the convictions are against the manifest weight of the evidence, she is required to present argument, citing to portions of the record in support. As previously referenced, "App.R. 16(A)(7) sets forth certain mandatory prerequisites which must be in the record for an assignment of error to properly be under consideration by an appellate court." *Village of Ottawa Hills v. Afjeh*, 6th Dist. Lucas No. L-04-1297, 2006-Ohio-2618, ¶ 65.

39.

In other words, Cantrill "must accompany each assignment of error with a legal argument rooted in citation to legal authority, whether statutory or caselaw." *Id.*

{¶ 79} Despite the lack of legal argument, we note that a manifest weight review regarding credibility is deferential. "In weighing the credibility of the witnesses, we extend deference to the jury's credibility determination, as the jury observed the witnesses' testimony, noting facial expressions, body language, and voice inflections, and had the opportunity to 'discern qualities such as hesitancy, equivocation, or candor (or the lack of it).'" *State v. Thomas*, 6th Dist. Lucas No. L-17-1266, 2019-Ohio-1916, ¶ 68, quoting *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. Cantrill points to nothing in the record that would undermine the jury's belief in the testimony of Coulter and Munoz, and therefore, we do not find that the jury lost its way.

{¶ 80} Accordingly, having considered the record as to the issues raised by Cantrill, we find her sixth assignment of error not well-taken.

### G. Consecutive Sentences

{¶ 81} In her seventh assignment of error, Cantrill argues that the imposition of consecutive sentences is unsupported by competent, credible evidence. In support, she argues that we "should hold trial courts to a higher standard of explicit reasoning to facilitate appellate review of how the trial court reached" its decision, citing no authority in support of this position.

{¶ 82} We review felony sentences not for abuse of discretion or even "explicit reasoning," but pursuant to R.C. 2953.08(G)(2). Pursuant to that statute, we "may

increase, reduce, or otherwise modify a sentence" if we find the imposition of consecutive sentences either lacks support in the record under R.C. 2929.14(C)(4), or the "sentence is otherwise contrary to law." *See* R.C. 2953.08(G); *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, 59 N.E.3d 1231, ¶ 22.

{¶ 83} Here, Cantrill argues the trial court erred in its findings in support of consecutive sentences, under R.C. 2929.14(C), based on the disparity of her sentence compared to the community control sanctions given to her codefendants. She contends that the same record may not support a consecutive prison term, where it results in community control for those participating in the same conduct. We note, however, that the law permits unequal sentences among codefendants. *State v. Anderson*, 151 Ohio St.3d 212, 2017-Ohio-5656, 87 N.E.3d 1203, ¶ 45. Furthermore, where—as here—the record reveals factual differences between the codefendants, a sentence falling within the statutory range is not presumptively a penalty for going to trial. *Anderson* at ¶ 24.

{¶ 84} Both Coulter and Munoz entered pleas to lesser-included offenses as part of their plea agreements, and in Coulter's case, additional charges were dismissed. Therefore, while Cantrill was convicted for more offenses, and offenses that were felonies of the second degree, her codefendants entered pleas to fewer offenses that were only felonies of the third degree. Furthermore, the trial court properly considered the factors under R.C. 2929.14(C)(4), which gives a sentencing judge discretion to impose consecutive sentences.

41.

{¶ 85} Consecutive sentences require affirmative findings under R.C. 2929.14(C)(4), as follows:

(4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 86} In sentencing Cantrill to consecutive sentences, the trial court noted the "complete and total devastation and destruction" on the lives of her victims, as well as the substantial economic loss caused. In making the required findings under R.C. 2929.14(C), the trial court referred to her presentence investigation report, and noted Cantrill's "significant criminal history, multiple felony convictions, misdemeanor related theft convictions" and her failure to respond "favorably to sanctions imposed resulting in unsuccessful community control termination and even ODRC incarceration" for past offenses. The trial court determined that imprisonment was necessary, not only for punitive purposes, but also to protect the public. In imposing sentence, the trial court stated that Cantrill "has proven to have little or no regard for person or property or for the criminal justice system." After considering the record, therefore, we find support for consecutive sentences, and Cantrill's seventh assignment of error is not well-taken.

## H. Restitution

{¶ 87} In her eighth assignment of error, Cantrill argues that the order of restitution is contrary to law, because she has no ability to pay restitution. In support, Cantrill argues that the trial court found she had no ability to pay court costs, yet determined she would have the ability to pay over $18,000 in restitution to the victims.[11] She argues that the trial court failed to properly consider her ability to pay restitution, and the order to pay restitution constituted an abuse of discretion. As previously noted,

---

[11] The trial court ordered restitution to the four victims in the amounts of $3,572, $2,095, $12,000, and $1,095, for a total restitution order of $18,762.

sentencing decisions are reviewed under R.C. 2953.08. Accordingly, in reviewing the order for restitution, we must determine whether the restitution imposed was contrary to law, rather than reviewing for an abuse of discretion. *State v. Farless*, 6th Dist. Lucas No. L-15-1060, 2016-Ohio-1571, ¶ 4, citing R.C. 2953.08(A)(4) and (G)(2)(b); *State v. Collins*, 2015-Ohio-3710, 41 N.E.3d 899, ¶ 31 (12th Dist.).

{¶ 88} Cantrill did not object to the order of restitution at the time of her sentencing. Therefore, her argument on appeal is reviewed for plain error. *State v. Bey*, 2019-Ohio-423, 130 N.E.3d 1031, ¶ 42 (6th Dist.), citing *State v. Griffin*, 6th Dist. Lucas No. L-11-1283, 2013-Ohio-411, ¶ 43. As plain error is error affecting substantial rights, it is reserved for only the exceptional case, with reversal of the restitution order necessary to prevent a manifest miscarriage of justice. *State v. Tucker*, 6th Dist. Sandusky No. S-11-003, 2012-Ohio-622, ¶ 6, citing *State v. Landrum*, 53 Ohio St.3d 107, 111, 559 N.E.2d 710 (1990).

{¶ 89} Cantrill argues that the trial court failed to "properly consider" her present and future ability to pay restitution, considering the trial court's waiver of all costs based on her inability to pay those costs. She provides no authority, however, to support her position that a determination as to costs binds the court in considering restitution. We have previously noted that the determination regarding costs "is separate and distinct from a determination that the person is indigent for purposes of paying a mandatory fine or financial sanction." (Citations omitted.) *Bey* at ¶ 46. Therefore, in making these separate determinations, a trial court could waive costs, yet impose restitution, consistent

44.

with the statutory requirements. *See State v. Spanks*, 10th Dist. Franklin No. 17AP-642, 2019-Ohio-678, ¶ 14 ("The fact that the court mitigated the award by excluding fines and other financial sanctions does not mandate a conclusion that the court could not award restitution."); *State v. McNeill*, 12th Dist. Warren No. CA2018-09-115, 2019-Ohio-1200, ¶ 14 ("By waiving court costs and other financial sanctions, the trial court indicated it considered appellant possessed means, although limited, to pay restitution.").

{¶ 90} "R.C. 2929.18(A)(1) authorizes a trial court to impose restitution as part of a sentence in order to compensate a victim for economic loss." *State v. Lalain*, 136 Ohio St.3d 248, 2013-Ohio-3093, 994 N.E.2d 423, ¶ 20. Before ordering restitution, the trial court must first determine whether the offender has a present or future ability to pay the amount determined as appropriate. *Bey* at ¶ 43, citing R.C. 2929.19(B)(5). While no hearing is required lacking any dispute as to the amount or restitution, the record must still contain evidence of an ability to pay, and demonstrate the trial court considered the ability to pay the restitution ordered. *Id.*, citing *State v. Flowers*, 6th Dist. Lucas No. L-14-1141, 2015-Ohio-908, ¶11-13, citing *State v. Phillips*, 6th Dist. Fulton No. F-05-032, 2006-Ohio-4135, ¶ 18.

{¶ 91} Cantrill did not dispute the amount of the award at the sentencing hearing, and did not argue she lacked a present and future ability to pay restitution. Prior to sentencing, the trial court referred the matter for a presentence investigation report, and this report contained, along with other information, Cantrill's financial, educational, and vocational information. The trial court indicated it reviewed this report in determining

45.

Cantrill's sentence, which included the order for restitution. Furthermore, while Cantrill was deemed indigent, this determination has no bearing on the trial court's consideration of restitution as a financial sanction. *Bey* at ¶ 46. Therefore, as the record demonstrates the trial court considered Cantrill's present and future ability to pay, we find no plain error in the order for restitution. Cantrill's eighth assignment of error is not well-taken.

### I. Cumulative Error

{¶ 92} Cantrill argues cumulative error, depriving her of a fair trial, as her ninth and final assignment of error. "The cumulative-error doctrine provides that 'a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial-court error does not individually constitute cause for reversal.'" *State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, ¶ 152, quoting *State v. Powell,* 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 223, citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus.

{¶ 93} The cumulative-error doctrine does not apply unless multiple instances of harmless error have been identified. *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). The state conceded error regarding the stipulation, which we determined as harmless. The inadvertent misgendering, moreover, while a mistake, is not cognizable as legal error. Accordingly, we find no cumulative error, and Cantrill's ninth assignment of error is not well-taken.

46.

## IV. Conclusion

**{¶ 94}** Finding substantial justice has been done, we affirm the judgment of the Lucas County Court of Common Pleas. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J.                          _____
                                                                JUDGE

Christine E. Mayle, J.

Gene A. Zmuda, P.J.                             _____
CONCUR.                                                         JUDGE

_____
                                                                JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.